# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Sierra Club,**
**Respondent Below, Petitioner**

**vs)  No. 13-0256** (Kanawha County 11-AA-102 and 11-AA-104)

**Patriot Mining Company, Inc. and**
**Thomas L. Clarke, Director, Division**
**of Mining and Reclamation, West Virginia**
**Department of Environmental Protection,**
**Petitioners Below, Respondents**

**FILED**

May 30, 2014

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Sierra Club, by counsel Derek Teaney and Peter Morgan, appeals the order of the Circuit Court of Kanawha County, entered February 13, 2013, reversing the decision of the Environmental Quality Board ("EQB" or "the Board"). The Board's decision remanded a permit of Respondent Patriot Mining Company, Inc. ("Patriot") to the West Virginia Department of Environmental Protection ("WVDEP") for the purpose of conducting an analysis of the reasonable potential for a discharge to cause or contribute to an excursion of a water quality standard and, where appropriate, set effluent limits. Respondent Patriot appears by counsel Robert G. McLusky, James R. Snyder, M. Shane Harvey, and Aaron S. Heishman. Respondent Thomas L. Clarke, director of the West Virginia Department of Environmental Protection Division of Mining and Reclamation, appears by counsel Jason Wandling. The West Virginia Chamber of Commerce has made an appearance as amicus curiae by counsel Christopher B. Power and Robert M. Stonestreet.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

### I.

In August of 2010, Patriot obtained, from the WVDEP, modification of a National Pollutant Discharge Elimination System ("NPDES") permit to expand its Monongalia County surface mining activity with an operation called New Hill West Surface Mine.[1] The modified

---

[1]The New Hill West Surface Mine is a 150-acre expansion of respondent mining company's 75-acre New Hill Surface Mine. Respondent Patriot represents that the New Hill

1

permit addressed two new outlets (No. 26 and No. 27) and two existing outlets (No. 1 and No. 6), all of which discharge to either Scotts Run, a tributary of the Monongahela River, or an unnamed tributary of Scotts Run. The permit specified maximum daily discharge limitations with respect to iron and aluminum for each of the outlets, and also with respect to manganese for Nos. 6, 26, and 27. It required that, for each of the four outlets, Patriot make quarterly reports with respect to the discharge of certain other materials, but did not set effluent limitations[2] for most of those materials. Limits were established for pH, total suspended solids, and settleable solids. Relevant to this appeal, only reporting was required for sulfate, specific conductance, and total dissolved solids ("TDS")[3].

---

Surface Mine operation has been successfully mined and reclaimed, and that it still discharges water from the site pursuant to its NPDES permit, which allowed respondent to discharge rainfall runoff after passing the runoff through sediment control ponds or pumps. Respondent represents that land within this operation, including its expanded area, has "legacy pollution issues" that predate state and federal surface mining laws, but that its activities have improved area water quality through isolation of refuse material that causes acid mine drainage.

[2]Effluent limitations are "restriction[s] established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters." 33 U.S.C. § 1362(11). They are required in permits for pollutants that "are or may be discharged at a level [that] will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality." 40 C.F.R. § 122.44(d)(1)(i). A permit writer may establish effluent limitations on a case-by-case basis (if the state has not already adopted specific limitations) after conducting a "reasonable potential analysis" to determine whether a reasonable potential exists for discharge containing a particular pollutant that would violate water quality standards. The circuit court explained that permit writers conducting reasonable potential analyses "look at the concentrations of pollutants in the stream that will receive the discharge. Next, the permit writers evaluate the observed or likely pollution characteristics of the effluent discharge, then calculate the probability that the effluent discharge will cause the concentration of the pollutant in the receiving stream to exceed the numeric water quality standard for that pollutant." *Final Order* at 6. However, this is the process applied when numeric water quality standards are at risk. The parties have presented no explanation of the process for conducting a reasonable potential analysis to evaluate compliance with narrative water quality standards.

[3]According to the EQB, specific conductance, or conductivity, is the measure of the presence of sulfates and other ions in discharges or receiving streams. *EQB Supplemental Final Order* at 9. Patriot explains that TDS is a measure of the weight of the ions dissolved in water. *Resp. Brief* at 4. Petitioner argued before the EQB that conductivity should be limited to 300 microsiemens/cm and TDS to 50 milligrams/L to protect the watershed and thus meet West Virginia's narrative water quality standards. (The EPA guidance, described in the body of this decision, sets a numeric limit on conductivity at 500 microsiemens/cm; however, the United States District Court for the District of Columbia found that this standard "removes the reasonable potential analysis from the realm of state regulators." *National Mining Association v. Jackson*, 880 F.Supp.2d 119, 141 (D.C. Cir. 2012).) Patriot argues that these limits proposed by

Prior to the modification of the permit, on April 1, 2010, the United States Environmental Protection Agency had issued a narrative guidance, "Improving EPA Review of Appalachian Surface Coal Mining Operations Under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order" ("EPA guidance"). The EPA guidance, citing federal regulations, notes that the Clean Water Act "requires NPDES permits to contain water quality-based effluent limitations when necessary to meet water quality standards" and explains that the permitting authority must conduct a "reasonable potential analysis" to determine whether the limits are necessary.[4] Three days after the permit was issued, the WVDEP issued its own "Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards" ("WVDEP guidance") and its "Justification and Background for Permitting Guidance." The WVDEP guidance required that if the WVDEP concluded that an outlet had a reasonable potential to cause or contribute to an "excursion" from the narrative water quality criteria, the permit should include whole effluent toxicity ("WET")[5] limitations. In cases of insufficient data, however, the WVDEP Guidance directs that a permit include monitoring requirements and triggers to determine whether such reasonable potential exists.[6] Once the monitoring shows reasonable potential, the permit is to be reopened for the inclusion of WET limits. This guidance, described as "dynamic," was effective upon issue.

Before Patriot began mining the expansion, petitioner appealed the permit modification to the EQB, which allowed Patriot to intervene in the appeal. The EQB then conducted a four-day hearing in December of 2010 and entered a final order finding that petitioner demonstrated that the watershed's levels of sulfate, conductivity, and TDS were above limits known to cause harm to aquatic life, thereby violating West Virginia's narrative water quality standards, and that studies show that these increased levels are due to elevated concentrations of sulfate, calcium, magnesium, and bicarbonate ions. The EQB remanded the permit modification to the WVDEP to conduct the appropriate analyses for conductivity, sulfate, TDS, and arsenic, and to include

---

petitioner would require the implication of expensive reverse-osmosis technology. We need not consider the proposed limitations or the potential costs for the purposes of this appeal.

[4]The EPA guidance also notes that most Appalachian states have narrative standards, but EPA regulations require the NPDES permits must contain provisions that implement both narrative and numeric water quality standards.

[5]According to the United States Environmental Protection Agency, "[w]hole effluent toxicity refers to the aggregate toxic effect to aquatic organisms from all pollutants contained in a facility's wastewater. . . . WET tests measure wastewater's effects on specific test organisms' ability to survive, grow and reproduce." http://water.epa.gov/scitech/methods/cwa/wet/index.cfm.

[6]The WVDEP guidance also provides, "If the applicant cannot demonstrate, by means of its chemical and biological monitoring and the control measures outlined in its [aquatic ecosystem protection plans], that it does not have [reasonable potential], the permit writer should treat new and expanded mining discharges as if they have [reasonable potential] and include WET limits in the permit. . . ."

appropriate effluent limitations. The order noted that the parties agreed a limit should have been included for manganese at Outlet No. 1, and that appropriate limits should be set for arsenic and selenium. Respondents appealed that decision to the circuit court with respect to the EQB's findings related to sulfate, conductivity, and TDS.

The circuit court entered an order on September 25, 2012, remanding to the EQB on the ground that the EQB should provide a more detailed explanation of its methodology, and that it had "failed to set forth a reasoned and articulate decision that can be subject to effective judicial review." The court directed the EQB to "include guidance to calculate threshold values for regulating conductivity, TDS, and sulfate." The EQB entered a supplemental final order on July 30, 2012, which included its original order and additional findings and conclusions, and also "directe[d] the WVDEP [to] use the EPA guidance[7], coupled with Dr. [Paul] Ziemkiewicz's calculated yields of solids, sulfate, and conductivity on the New West Hill site as a roadmap toward setting effective conductivity limits on the New West Hill permit."[8]

The circuit court entered its final order on February 12, 2013, and concluded:

> After a thorough review of the record, it is evident that the EQB accorded no deference to WVDEP's interpretation of water quality standards. In fact, the EQB orders that the EPA's Narrative Guidance be followed, instead of using WVDEP's Narrative Guidance. This [c]ourt finds that to apply EPA's Narrative Guidance would infringe on the authority afforded to WVDEP. Therefore, the [c]ourt concludes that the EQB's decision was arbitrary and capricious.

---

[7]Respondent Clarke argues that the EPA Guidance was merely an interim guidance, replaced by a final guidance on July 22, 2011, and later vacated by a federal district court on July 31, 2011. *See National Mining Association v. Jackson*, 880 F.Supp.2d 119 125 (D.D.C. 2012). He argues that the EQB did not sufficiently clarify whether it was directing the WVDEP to use the interim guidance or the final guidance, but that the direction was inappropriate in either case. We find that the "direction" to use the guidance was merely a suggestion meant to clarify the earlier order upon the circuit court's order requiring detailed methodology, and we thus find it unnecessary to consider the validity of either the EPA's interim or final guidance. In any event, we find neither the EPA guidance, nor the WVDEP guidance (published after the issuance of the permit that is the subject of this action) controlling. While we do not accept the WVDEP guidance as prevailing policy at the time of the modification of the permit for the New Hill West Surface Mine, we are mindful of the contents for evidentiary purposes, insofar as it purports to be the culmination of WVDEP's study of "subject matter uniquely within [WV]DEP's expertise and special knowledge" and its efforts to "facilitate compliance with applicable statutory and regulatory requirements and to provide reasonable means of effectuating the intent of the narrative criteria. . . ."

[8]Dr. Ziemkiewicz testified at the EQB hearing. However, the transcript excerpts of his testimony contained in the appendix do not include information about his credentials.

Petitioner appeals the circuit court's order to this court. In the case sub judice, the circuit court reversed an order of the Environmental Quality Board. Our review of the circuit court's decision in an administrative appeal is de novo. *See Tennant v. Callaghan*, 200 W.Va. 756, 761, 490 S.E.2d 845, 850 (1997). In conducting that review, however, we are subject to the same governing standards of review that controlled the circuit court's actions. *West Virginia DEP v. Kingwood Coal Co.*, 200 W.Va. 734, 736, 490 S.E.2d 823, 825 (1997). Those standards are contained in Syllabus Point 2 of *Shepherdstown Volunteer Fire Department v. State ex rel. State of West Virginia Human Rights Commission*, 172 W.Va. 627, 309 S.E.2d 342 (1983):

> Upon judicial review of a contested case under the West Virginia Administrative Procedure[s] Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are "(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

With these standards in mind, we review petitioner's three assignments of error: first, that the circuit court erred in concluding that the decision of the EQB was arbitrary and capricious because the court erroneously determined that the EQB had to defer to WVDEP's interpretation of water quality standards; second, that the circuit court disregarded the EQB's findings of fact, which were issued subsequent to a four-day hearing; and finally, that the circuit court erred in reversing the final order and supplemental order of the EQB, when the appropriate remedy would have been remand.

II.

Petitioner's assignments of error are procedural in nature, requiring awareness of the administrative structure of the state agencies here involved and, to some degree, the interplay between our own Water Pollution Control Act, West Virginia Code § 22-11-1 et seq., and federal law. The NPDES permit system (pursuant to which respondent mining company's permit was issued) is created by Section 402 of the Federal Water Pollution Control Act, also known as the Clean Water Act. 33 U.S.C. 1342. The Clean Water Act serves to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *PUD No. 1 of Jefferson County v. Wash. Dept. of Ecology*, 511 U.S. 700, 704, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994)(quoting 33 U.S.C. § 1251(a)). To that end, it uses two approaches to control water pollution: (1) technology-based regulations; and (2) water quality standards. *Arcadia v. United States EPA*, 265 F.Supp.2d 1142, 1143 (2003). "Technology-based regulations seek to reduce pollution by requiring a discharger to effectuate equipment or process changes, without reference to the effect on the receiving water; water quality standards fix the permissible level of pollution in a specific body of water regardless of the source of pollution." *Id.* at 1143–44.

In short,

> the Clean Water Act provides for two sets of water quality measures. First, the EPA establishes and enforces limitations on discharges from point sources. To discharge, an individual must obtain a permit from the EPA or an EPA-authorized state agency. Second, states must promulgate water quality standards for intrastate waters. These standards must have three elements: (1) states must give each body of water a "designated use"; (2) states must specify for each body of water the amounts of various pollutants or pollutant parameters that may be present without impairing the designated use; and (3) states must adopt a nondegradation policy which allows the state to assess activities that may lower the quality of the water body.

*Pennaco Energy, Inc. v. United States Environmental Protection Agency*, 692 F.Supp.2d 1297, 1302 (D. Wyo. 2009).

States may apply for delegated authority to implement NPDES permitting and, if the United States Environmental Protection Agency approves, the state receives delegated authority over the program. *Jackson*, 880 F.Supp.2d at 125. West Virginia has been granted such authority. *Id*. at n.5. Our legislature has given the Secretary of the West Virginia Department of Environmental Protection the authority "[t]o perform any and all acts necessary to carry out the purposes and requirements of [the state Water Pollution Control Act] and of the 'Federal Water Pollution Control Act' . . . relating to this state's participation in the 'National Pollutant Discharge Elimination System' . . . established under that act. . . ." W.Va. Code § 22-11-4(a)(1) (2009).

> In accordance with Section 301 of the [Clean Water Act], 33 U.S.C. § 1313, NPDES permits "typically contain numerical limits called 'effluent limitations' that restrict the amounts of specified pollutants that may be discharged." Defs.' Mem. at 9. "Water quality based effluent limitations are required for all pollutants that the permitting authority determines 'are or may be discharged at a level [that] will cause, have the reasonable potential to cause, or contribute to an excursion above any [applicable] water quality standard, including state narrative criteria for water quality.'" *Id*. (quoting 40 C.F.R. § 122.44(d)(1)(i)). Accordingly, the procedure for determining the need for effluent limits is called a reasonable potential analysis. If the discharge does have the reasonable potential to cause an excursion above a numeric or narrative water quality standard set in accordance with Section 303 of the [Clean Water Act], the state must develop permit limitations to ensure compliance with that water quality standard. *See Am. Paper Inst. v. EPA*, 996 F.2d 346, 349 (D.C.Cir.1993). . . . To achieve this compliance, the states may establish either numeric or narrative permit limits. *See id*. (noting that criteria come in "two varieties: specific numeric limitations on the concentration of a specific pollutant in the water ... or more general narrative statements applicable to a wide set of pollutants").

6

*Jackson*, 880 F.Supp.2d at 126. West Virginia has articulated narrative water quality standards that are violated if wastes discharged from a surface mining operation "cause . . . or materially contribute to" (1) "[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life" or (2) a "significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems."[9] W.Va. Code R. §47–2–3.2.e, –3.2.i. As noted in *Jackson*, though water quality standards are developed by the states, the federal Environmental Protection Agency must review the standards for approval. *See* 33 U.S.C. § 1313(c). "The EPA may assume the role of actually promulgating water quality standards only if (1) it determines that a state's proposed new or revised standard does not measure up to the Clean Water Act's requirements and the state refuses to accept EPA-proposed revisions, or (2) a state does not act, and the EPA determines that a new or revised standard is necessary." *Jackson*, 880 F.Supp.2d at 127.

While the WVDEP has been granted the authority to develop these standards on behalf of this State, its permitting actions are reviewable. The EQB, formerly known as the Water Resources Board, was continued by the state legislature in 1994.[10] W.Va. Code § 22B-3-1 (2010). West Virginia Code § 22-11-21 provides:

> Any person adversely affected by an order made and entered by the [Director of the Department of Environmental Protection] in accordance with the provisions of [the Water Pollution Control Act, West Virginia Code § 22-11-1, et seq.], or aggrieved by failure or refusal of the [Chief of the Office of Water Resources of the Department of Environmental Protection] to act within the specified time as provided in subsection (e) of section eleven [§ 22-11-11(e)] of this article on an application for a permit or aggrieved by the terms and conditions of a permit granted under the provisions of this article, may appeal to the environmental quality board, pursuant to the provisions of article one, chapter twenty-two-b [§§ 22B-1-1 et seq.] of this code.

---

[9]Neither the WVDEP nor the EPA has implemented regulations establishing numeric standards for sulfate, TDS, or conductivity.

[10]Respondent Patriot challenges the credentials of the Board, characterizing its composition as "part-time political appointees." The EQB is composed of five members appointed by the governor with the advice and consent of the Senate. W.Va. Code § 22B-3-1(b). In its final order issued in this case, the EQB described the qualifications of its current members: Dr. Ed Snyder, who holds a Ph.D. in geology, is a professor at Shepherd University; Dr. Scott Simonton, who holds a Ph.D. in engineering, is a former WVDEP permit writer and currently teaches environmental sciences at Marshall University; Dr. James van Gundy, who holds a Ph.D. in aquatic ecology, is an emeritus professor of environmental sciences at Davis & Elkins College; William Gillespie, described as an expert in paleobotany, geology, and forestry, is a former professor of geography and geology at West Virginia University; and Ted Armbrecht, former chief executive officer of Stone & Thomas Department Store, is a Mountain Institute board member and a member of the Nature Conservancy.

III.

Petitioner's first assignment of error on appeal is that the circuit court erroneously concluded that the EQB was required to defer to the WVDEP's interpretation of water quality standards. We disagree with the circuit court and the parties that this case involves a question of deference to the WVDEP's authority, because there is no evidence in the appendix record on appeal that, at the time it approved modification of the permit, the WVDEP had developed relevant formal policies to which the EQB was required to defer.[11] In fact, Patriot clarifies in its brief that "there had been no previous efforts by WVDEP to explain how these [narrative water quality] standards can be interpreted or practically implemented before WVDEP released its [n]arrative [g]uidance documents." Rather, the issue appears to be a question of whether the EQB had a sufficient basis for remanding the permit to the WVDEP with the requirement that the WVDEP conduct reasonable potential analyses[12] and set effluent limitations for sulfate, conductivity, and TDS to meet State narrative water quality standards[13].

---

[11]The guidance that respondents suggest embody the WVDEP interpretation did not exist at the time this New Hill West Surface Mine permit was modified, and we are loath to charge the Board with lacking deference under these circumstances. The water quality standards promulgated by WVDEP require, in part, that the agency address "[m]aterials in concentrations which are harmful . . . to . . . aquatic life." It is not apparent that the EQB attempted to alter this standard but it instead found, based on the evidence presented at the hearing, that the permit did not contain sufficient effluent limitations to ensure that aquatic life was protected, and thus achieve the existing water quality standard. Though we find that the EQB's order and supplemental order are not supported by the evidence, we do not herein consider whether the EQB exceeded its authority in the manner of review.

[12]Respondent states that the "EPA has developed comprehensive instructions to help permit writers conduct reasonable potential analyses for compliance with numeric water standards." Unfortunately, the technical support document that it references in support of this statement was not included in the appendix record on appeal. Neither party has suggested, however, that the EPA has developed such comprehensive instructions for compliance with narrative standards. We are left with little or no insight into the methodology required to conduct a reasonable potential analysis, and it is therefore not clear how petitioner asserts that the WVDEP's actions were deficient.

[13]One federal district court has explained the difficulty that states have faced with respect to enforcing narrative water quality standards:

Of course, the water quality standards by themselves have no effect on pollution; the rubber hits the road when the state-created standards are used as the basis for specific effluent limitations in NPDES permits. . . . When the standard includes numeric criteria, the process is fairly straightforward: the permit merely adopts a limitation on a point source's effluent discharge necessary to keep the concentration of a pollutant in a waterway at or below the numeric benchmark. Narrative criteria, however, present more difficult problems: How is a state or federal NPDES permit writer to divine what limitations on effluent discharges are

8

The WVDEP guidance justification and background paper concluded that because "conductivity represents the combined concentrations of all different dissolved ions, each with potential varying toxic effects, regulation solely via an indicator such as specific conductance is not the best way to protect against excursions from narrative standards."[14] Furthermore, at the hearing, WVDEP's NPDES program manager Jeffrey Parsons testified that it was not possible to conduct reasonable potential analyses for conductivity or sulfate because there is no consensus about toxicity levels for these measures.[15] Though the EQB relied on evidence suggesting that

---

necessary to assure that the waterway contains, for example, "no toxics in toxic amounts"? Faced with this conundrum, some permit writers threw up their hands and, contrary to the Act, simply ignored water quality standards including narrative criteria altogether when deciding upon permit limitations. *See Natural Resources Defense Council v. EPA*, 915 F.2d 1314, 1317 (9th Cir.1990). Additionally, when standards containing narrative criteria were enforced—often through the device of whole effluent discharge limitations based on biological monitoring techniques, see 48 Fed.Reg. 51,400, 51,402 (1983) (noting that biological monitoring is one method of testing compliance with narrative criteria)—the lack of standardized procedures made it impossible to even approximate consistency in the translation of criteria into permit limitations. Cf. 57 Fed.Reg. 60,848, 60,851 (1992). Moreover, the biological monitoring techniques relied on to enforce narrative criteria were better suited to assuring protection of aquatic life than human health. *See* 131 CONG.REC. 15,324 (1985) (Statement of Senator Stafford). Thus, in the EPA's view, the lack of a required procedure for developing water-quality-based permit limits from narrative criteria hamstrung attempts to fulfill the statutory requirement that NPDES permits contain limitations necessary to meet all water quality standards. *See* 54 Fed.Reg. 23,868, 23,877 (1989) (noting that the EPA's legal obligation to assure that NPDES permits meet *all* applicable water quality standards could not be set aside until states promulgate numeric water quality criteria for all their standards).

*American Paper Institute, Inc. v. U.S.E.P.A.*, 996 F.2d 346, 350 (D.C. Cir. 1993).

[14]Explaining its use of the West Virginia Stream Condition Index ("WVSCI") scores for the purpose of evaluating the health of aquatic ecosystems, the WVDEP wrote:

. . .[WV]DEP's data shows that more than a simple conductivity measurement is necessary to determine the health of a stream. As proof that a number for specific conductance is an inappropriate gauge, . . . a stream can have a low level of specific conductance and a WVSCI score that indicates the stream is firmly within the range for impairment; conversely, a stream can have a high level of specific conductance and a WVSCI score that indicates the stream is above the threshold for impairment.

[15]Because there is no evidence before us regarding the methodology behind reasonable potential analyses with regard to narrative standards, we easily envision a method under which some monitoring (as the WVDEP included in the New Hill West Surface Mine modified permit)

conductivity levels should remain below 500 microsiemens/cm to protect the mayfly population, and ultimately the stream function, for example, we are not persuaded by the evidence of record that there is adequate agreement in the scientific community to trigger the WVDEP to conduct a reasonable potential analysis regarding sulfate, conductivity, or TDS under these circumstances. Contrary to petitioner's argument in its second assignment of error, in which it states that the circuit court ignored the EQB's findings of fact, we find that the EQB order and supplemental order failed to address its disregard of this meaningful evidence presented by respondents. We thus find that the circuit court could have determined that the EQB erred under the standards set forth in Syllabus Point 2 of *Shepherdstown Volunteer Fire Department*, 172 W.Va. 627, 309 S.E.2d 342, particularly in light of the arbitrary nature of the EQB order, which offered no discussion about the relationship between reasonable probability analyses and narrative water quality standards. Accordingly, we reject petitioner's first and second assignments of error.

Finally, petitioner argues that, if the circuit court's decision on the merits were correct, the proper remedy would have been remand to the EQB because the circuit court effectively reversed unchallenged EQB determinations in the administrative appeal. Petitioner argues that Patriot did not appeal the EQB's instructions with respect to arsenic, manganese, selenium, and WET limits. Patriot counters that it did, in fact, appeal the imposition of WET limits to the circuit court on April 25, 2011, and again on August 30, 2012. We accept this as true because petitioner did not dispute the assertion on reply.[16] Respondent did not, however, appeal the EQB's order to the circuit court insofar as the EQB remanded the permit to require the WVDEP to conduct reasonable potential analyses for arsenic and to include appropriate limitations for manganese and selenium. Nevertheless, remand is not necessary. These issues are not so intertwined that this Court is unable to exercise its inherent authority and fashion appropriate relief.

For the foregoing reasons, we affirm the final order of the circuit court insofar as it reversed the portions of the final and supplemental orders of the EQB that would have required

---

would be predicate to an analysis. Even the circuit court explained that, at least where numeric standards are involved, permit writers must "evaluate the observed or likely pollution characteristics of the effluent discharge. . . ." EPA regulations suggest that some monitoring is necessary, as well. A permitting authority "shall use procedures which account for existing controls on point and nonpoint sources of pollution, *the variability of the pollutant or pollutant parameter in the effluent,* the sensitivity of the species to toxicity testing (when evaluating whole effluent toxicity), and where appropriate, the dilution of the effluent in the receiving water" when it determines whether a pollutant discharge has the reasonable potential to cause an excursion above a water quality standard. 40 C.F.R. at § 122.44(d)(1)(ii)(emphasis supplied).

[16]Patriot references its petitions for appeal to the circuit court in support of the assertion that it appealed the EQB order insofar as it directed the WVDEP to include WET limits in the permit. Neither petition is included in the appendix record on appeal, and no supplemental appendix has been offered. Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure requires that arguments "contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal."

the WVDEP to conduct reasonable potential analyses and thereafter include specific effluent limitations with regard to sulfate, conductivity, and TDS in the modified permit. To the extent that the final order purports to reverse the EQB's ruling on those matters not raised on appeal to the circuit court, that order is vacated.

Affirmed in part, vacated in part.

**ISSUED:** May 30, 2014

**CONCURRED IN BY:**

Chief Justice Robin Jean Davis
Justice Menis E. Ketchum
Justice Allen H. Loughry II

**DISSENTING:**

Justice Brent D. Benjamin
Justice Margaret L. Workman

11